Paul T. Trimmer, Bar #9291
trimmerp@jacksonlewis.com
Mahna Pourshaban, Bar #13743
mahna.pourshaban@jacksonlewis.com
**JACKSON LEWIS P.C.**
3800 Howard Hughes Pkwy, Suite 600
Las Vegas, Nevada 89169
Tel: (702) 921-2460
Fax: (702) 921-2461

*Attorneys for Defendant*
*Victoria Partners d/b/a*
*Monte Carlo Resort and Casino*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| LISA NIGRELLI, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>VICTORIA PARTNERS, d/b/a MONTE CARLO RESORT AND CASINO; and CULINARY WORKERS UNION LOCAL 226; and DOES 1-50, inclusive<br><br>Defendants. | Case No. 2:15-cv-01840-GMN-NJK<br><br>**DEFENDANT VICTORIA PARTNERS d/b/a MONTE CARLO RESORT AND CASINO'S MOTION FOR SUMMARY JUDGMENT** |

Defendant Victoria Partners d/b/a Monte Carlo Resort and Casino (hereinafter collectively referred to as "Defendant"), by and through its counsel of record, Jackson Lewis P.C., hereby moves for summary judgment pursuant to Fed. R. of Civ. Pro. 56. The undisputed facts demonstrate that (1) the two-hour change in Plaintiff Lisa Nigrelli's ("Nigrelli" or "Plaintiff") scheduled start times on Mondays and Tuesdays did not violate the terms of the 2013-2018 Collective Bargaining Agreement; and (2) the Culinary Workers Union Local 226 did not breach its duty of fair representation in processing Plaintiff's grievance.  Plaintiff's hybrid action under Section 301 of the Labor Management Relations Act therefore fails as a matter of law.

This motion is made based on the following Memorandum of Points and Authorities, all pleadings and documents on file with the Court and any oral argument the Court deems appropriate.

Dated this 20th day of June, 2016.

JACKSON LEWIS P.C.

_____/s/ Paul T. Trimmer_____
Paul T. Trimmer, Bar #9291
Mahna Pourshaban, Bar #13743
3800 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169

*Attorneys for Defendant*
*Victoria Partners d/b/a*
*Monte Carlo Resort and Casino*

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Plaintiff, Lisa Nigrelli is a cocktail server at Defendant's Hotel and Casino.  She is represented by Culinary Workers Union Local 226 (the "Union"), and the terms and conditions of her employment are governed by the collective bargaining agreement ("CBA" or the "Agreement") between the Company and the Union.  Since June 1999, Nigrelli has worked the swing shift on Mondays 5:00 p.m. – 1:00 a.m., Tuesdays 5:00 p. m. – 1:00 a.m.  She works what is referred to under the collective bargaining agreement as a "relief shift," meaning her scheduled start times and pit locations vary depending on the day of the week because she is stepping into the shoes of – "relieving" – other full time cocktail servers on their days off.

The primary purpose of the cocktail staff is to service casino guests, and in the spring of 2015, Monte Carlo made substantial revisions to its cocktail server schedule so that it would better align with casino business volumes.  Monte Carlo's casino business was picking up later in the night (around 8 p.m.) and it therefore had an excess number of swing shift cocktail servers on the floor at 5 p.m. and 6 p.m. As a result, the scheduled start times of several cocktail servers, including Nigrelli, were changed.   More specifically, Nigrelli's Monday and Tuesday start times were

changed from 5 p.m. to 7 p.m., and her lawsuit arises out of that change.[1]  She contends that when the Company required her to come to work two hours later, it violated the "seniority provisions" of the CBA.[2]  That is simply not the case.

Under the collective bargaining agreement, scheduling is **not** controlled by the seniority provisions in Article 20.  To the contrary, it is a right reserved exclusively to the Monte Carlo by the express terms of the Management Rights Clause in Article 23.01:

> The right to manage the Employer's business and the direction of its employees, including, but not limited to, the following rights, are reserved to the Employer. **Such rights include the right to direct, plan and control operations, to determine the number of employees to be employed, and to determine the means, methods and schedules of operations.** The Employer shall have the sole right to direct and control its employees. **The Employer reserves the right, which is hereby recognized by the Union, to initiate any action toward any employee, including, but not limited to**, reclassification, retention, **scheduling, assignment,** promotion, transfer, layoff and/or rehire. Seniority, among other factors, will be considered by the Employer when making these decisions. All of the foregoing rights are reserved to the Employer except to the extent they may be contrary to or inconsistent with the terms and conditions of this Agreement.

**Exhibit 1** at 61 (emphasis added).  Taken together, the Management Rights Clause safeguards the ongoing success of the enterprise, ensuring that the Company has the ability adapt its business operations to business needs, including the ability to schedule its workers, eliminate their bidded for positions, and lay them off.

A number of "past practices" have developed which guide the Company when exercising that discretion in the context of scheduling, including what is referred to as the "two hour rule," which allows the Company to modify scheduled start and end times up to two hours without eliminating the employee's position and triggering rebidding and "bumping," as well as the requirement that individuals working a relief shift must match the start and end times of the employee to whom they are providing relief.  The role of seniority in making those decisions, however, is spelled out in the Management Rights clause itself: it is nothing more than a factor,

---

[1]    Nigrelli's other start times did not change.

[2]    *See* ECF No. 4 at ¶ 65, *see also* Nigrelli Depo. **Exhibit 2** at 28:4-16.

1  "among other factors," which will be considered.  *Id.*  It does not, as Nigrelli believes, limit the

2  Company's ability to change her start times on Monday and Tuesday by two hours.  Moreover, her

3  belief is not sufficient to withstand summary judgment, particularly when: 1) the text of the CBA

4  does not support her positions; 2) she could not identify a single provision of the collective

5  bargaining agreement which had been breached during her deposition or in her responses to

6  discovery; and, 3) the deposition testimony from knowledgeable Company and Union witnesses

7  unanimously confirmed that the "two hour rule" had been exercised properly in this case.

8  The facts are not in dispute.  Monte Carlo did not violate the collective bargaining agreement

9  when it changed Nigrelli's Monday and Tuesday start times from 5 p.m. to 7 p.m., and the Union

10  did not breach the duty of fair representation when it refused to take Nigrelli's meritless grievance

11  to arbitration.  Nigrelli's Section 301 hybrid claim therefore fails as a matter of law, and the Court

12  should enter summary judgment in Monte Carlo's favor.

## II.   RELEVANT UNDISPUTED FACTS

### A.   Background Facts About The Parties

15  Monte Carlo Resort and Casino is a hotel and casino that operates on the Las Vegas Strip.

16  ECF No. 4 at ¶10.  Approximately half of Monte Carlo's employees are represented by the Union,

17  including food and beverage employees, and the terms and conditions of their employment are

18  governed by a collective bargaining agreement.  *See* **Exhibit 1**.  The Agreement applicable to this

19  case has an effective term of June 1, 2013 through May 31, 2018.  *Id.*

20  Nigrelli, as a cocktail server, is covered by the CBA.  *Id.* at 2.  She was hired in 1996, and

21  is currently the fourth most senior cocktail server.  **Exhibit 2** (Nigrelli Depo.) at 9:1-4.  In 1999,

22  Nigrelli bid for and was awarded what is referred to under the CBA as a "relief" schedule which

23  consisted of the following combination of days, hours, and pit locations:

| Days | Monday | Tuesday | Friday | Saturday | Sunday |
|---|---|---|---|---|---|
| Hours | 5 pm to 1 am | 5 pm to 1 am | 8 pm to 4 am | 5 pm to 1 am | 5 pm to 1 am |
| Locations | Pit 3 | Pit 3 | Pit 9 | Pit 2 | Pit 2 |

28  Plaintiff's Monte Carlo Position Bid Sheet attached as **Exhibit 11**.

**B.     Relevant Provisions Of The CBA**

As a "relief employee," **Exhibit 2** at 27:4-5, Nigrelli's status under the CBA is somewhat unique.  She is a full time employee, but rather than working a five day shift with fixed hours and locations, relief employees work varied shifts to relieve other regular employees on the latter's day(s) off.  **Exhibit 1** at 14.  As Monte Carlo's Director of Food and Beverage Nicholas Kabetso explained, relief employees' schedules always mirror the schedule of the employee to whom they are providing relief.  **Exhibit 3** (Kabetso Depo.) at 99:1-16.

To that end, and as mentioned above, employee scheduling is governed by Article 23.01's Management Rights Clause. *Id.* at 61.  It provides:

> The right to manage the Employer's business and the direction of its employees, including, but not limited to, the following rights, are reserved to the Employer. **Such rights include the right to direct, plan and control operations, to determine the number of employees to be employed, and to determine the means, methods and schedules of operations.** The Employer shall have the sole right to direct and control its employees. The Employer reserves the right, which is hereby recognized by the Union, to initiate any action toward any employee, including, but not limited to, reclassification, retention, scheduling, assignment, promotion, transfer, layoff and/or rehire. Seniority, among other factors, will be considered by the Employer when making these decisions. All of the foregoing rights are reserved to the Employer except to the extent they may be contrary to or inconsistent with the terms and conditions of this Agreement."

*Id.*

As Nigrelli, Kabetso and Johanna Dalton, the Union's Director of Organizing, explained in their depositions, the Company and the Union also have a decades-old past practice called the "two hour rule" which bears on the Company's right to schedule employees under the CBA.  **Exhibit 2** at 92:16-93:7; **Exhibit 3** at 84:23-85:1; **Exhibit 4** (Dalton Depo.) at 12:2-5.  The "two-hour rule" provides that management may change the starting and ending time of an employee's shift by two hours in either direction without creating a new shift and without violating the CBA.[3]  **Exhibit 2** at 92:16-93:7; 97:17-19; **Exhibit 3** at 86:18-25; **Exhibit 4** at 52:16-21.

---

[3]      In order to understand the manner in which Defendant schedules relief employees, it is important to distinguish the difference between shift, and station.  The term "shift" in Article 20.04(b) means the days of the week and the hours that an employee works.  **Exhibit 3** at 26:13-17.  The term "station" in Article 20.04(b) means the locations that an employee works.  *Id.*

Jackson Lewis P.C.
Las Vegas

Kabetso and Dalton's testimony is confirmed by labor arbitration awards involving the same contractual language at other properties on the Las Vegas Strip.[4]  In a 1997 arbitration award involving Flamingo Hotel and Culinary Workers Union Local 226, the arbitrator relied on testimony from the Union's then Director of Legal Affairs, Jim Bonaventure concluded that "evidence indicates that since 1982 the parties have operated with a "60% and two hours rule" to determine whether a shift has "changed" and rebidding is required.[5]  *Flamingo Hotel, Employer and Culinary Workers Union Local 226* 1997 WL 24154 attached as **Exhibit 5**.  As explained in that case,  a shift and station are deemed to continue "if 60% of the employee's shift has starting and ending times within two hours of the starting and ending time of the pre-change shift." *Id.*

An arbitrator applied the two hour rule in a similar fashion in a 2008 award involving the Sahara Hotel & Casino and Culinary Workers Union Local 226.  *In the Matter of an Arbitration Between Culinary Workers Union Local 226 and Sahara Hotel & Casino* attached as **Exhibit 6**.  In that case, the Sahara was realigning its cocktail pit "changing [swing shift employee] schedules from 7 p.m. to 3 a.m. to 5 p.m. to 1 a.m. and finally from 3 p.m. to 11 p.m."  Once again, Mr. Bonaventure, testified about the "two hour rule" and reiterated that the two hour rule allows the employer to change an employee's hours of work either way from the scheduled starting time.  *Id.* The arbitrator ruled that the Sahara had the right to make multiple two hour adjustments to scheduled start times under the two hour rule and did not violate the seniority provisions of the collective bargaining agreement by doing so.  *Id.*

In her Amended Complaint, the Plaintiff contends that the CBA's seniority provisions are also applicable to this case.  Those provisions are found in Article 20: 20.10 Probationary Period,

---

[4]    Through the 1970's and into the 1980's, the majority of the hotel casinos on the Las Vegas Strip negotiated with the Culinary Union together in a multi-employer group.  As a result, the wording of the collective bargaining agreements at most hotel casinos is very similar as are the applicable past practices.

[5]    This is the problem with the Plaintiff's argument.  Even if one assumed that she were right and that the two hour change meant that her schedule had changed, it would not entitle her to keep her shift.  It would require the Company to treat her original schedule as having been eliminated, and then bump her into the scheduled of the next most senior cocktail server on the swing shift. That may or may not result in a change of hours and days off.

20.02 Definition of Seniority, 20.03 Layoffs and Recalls, 20.04 Promotions and Preference for Shifts, 20.05 Break in Continuous Service and Seniority, and 20.06 Notification.  **Exhibit 1** at 50. Plaintiff, however, conceded in her deposition that none of the above referenced provisions were violated when the Company changed her Monday and Tuesday start times.  **Exhibit 2** at 38:19-39:6.

### C.   Defendant's Operations and Scheduling of Cocktail Servers

Defendant's casino has both slots and table game operations.  **Exhibit 3** at 18:21-23.  Both areas, table games and slots, are broken into smaller subsections referred to as "pits."  *Id* at 17:19-21.  During the time period relevant to this case, there were four numbered table game pits on the casino floor.  *Id* at 18:3-6.  There is no dispute that when the contractual provisions described above are applied, the Company exercises its discretion to establish the schedule.  The process begins with an evaluation of business and labor needs.  The Company selects the number of cocktail servers it needs for each pit on the day, swing and graveyard shifts, as well as those shift start times, and then posts them for bid.  *Id.* at 11:11-15.  Cocktail servers then bid to work the vacant schedule, and if awarded that schedule, continue to work it until the schedule is eliminated or the server bids into a different open schedule.  *Id* at 11:11-15.  Once awarded, the schedule and pit assignments are inseparable.  Servers cannot bid separately for different times in the same pit or for the same times in a different pit.  *Id.*

When Defendant chooses to change the schedules of their cocktail servers, Defendant can do so in one of two ways.  *Id* at 22:21-24.  The first is through eliminating the schedules deemed unnecessary and then allowing the servers who worked the eliminated shifts to bump the least senior server on the same shift via a method called "Deckering," which is named after a grievance involving an employee at the Stardust.  **Exhibit 3** at 23:12-18.  If the employee being eliminated is the least senior on that shift, the employee loses full time status and processed to the layoff/on call list.  *Id.*

The second method Defendant can use is the afore-mentioned two-hour rule.  *Id.* at 41:8-14.  As with layoff and eliminating shifts, the Company need not eliminate or change the employees who are least senior first.  To the contrary, employee seniority does not have to be considered at

all. *Id* at 41:8-14; *Id.* at 87:5-7. Therefore, if Defendant chose to change a cocktail server's scheduled start time in Pit 3 from 9:00 a.m. to 11:00 a.m. this would be permissible under the two-hour rule. *Id.* However, in accordance with the aforementioned change, Defendant must also change the start and end times of the swing (relief shift) and grave shifts. *Id* at 90:5-11. For example, if Tina worked Pit 3 five days a week, she would be considered the main pit 3 person. As such, the "relief" server must follow Tina and that particular stations schedule. *Id* at 69:9-16. It is past practice that the relief person, for consistency of the station, must always follow the station time, otherwise there would be instances where a specific pit may not have coverage. *Id* at 69:23-25.

### D.    Nigrelli and the Events of this Case

#### 1.    Pre-Schedule Change

As noted above, Nigrelli bid for and was awarded a **relief** schedule in 1999:

| Days | Friday | Saturday | Sunday | Monday | Tuesday |
|---|---|---|---|---|---|
| Hours | 8 pm to 4 am | 5 pm to 1 am | 5 pm to 1 am | 5 pm to 1 am | 5 pm to 1 am |
| Locations | Pit 9 | Pit 2 | Pit 2 | Pit 3 | Pit 3 |

*See* **Exhibit 11**. At some point prior to the events leading to this case, Nigrelli's Friday start time changed to 7 p.m. to 3 a.m.

In late 2014, Defendant began the process of considering changes in its cocktail staff, including schedule changes, to better reflect the changes in existing business demand and future demand in the form of the T-Mobile Arena and the remodeled Monte Carlo theater. **Exhibit 3** at 16:2-6. Specifically, Defendant's short term business goals were to align their labor with business levels of the casino. **Exhibit 3** at 46:7-8. Business between 5:00 p.m. to 7:00 p.m. was slower as compared to 7:00 p.m. to 9:00 p.m. *Id* at 46:9-13. In other words, business at Defendant's casino would pick up after 7:00 p.m., but because most of the Company's swing shift cocktail servers started at 5:00 p.m., there was over coverage (excess labor) during the 5:00 p.m. period, and under coverage as the night progressed which triggered the change in schedule for cocktail servers. *Id* at 46:14-19. In addition, Defendant was anticipating long term change because of the opening of the

T-Mobile arena in April 2016, and the renovation of the Monte Carlo theater. **Exhibit 2** at 312:14-19. **Exhibit 4** at 56:17-20. The Company involved the Union and a representative committee of cocktail servers in discussions about the schedule change so that the modifications would both satisfy business needs and minimize negative impacts on employees. **Exhibit 4** at 32:24-25; 33:1-11.

The Union assigned Organizing Director Johanna Dalton ("Dalton") to represent the cocktail servers in connection with the proposed schedule changes. **Exhibit 4** at 11:10-13. During January of 2015, Defendant's Beverage Manager Phillip Dow ("Dow") proposed a new schedule to cocktail servers. **Exhibit 3** at 34:24-25-35:1-3. The proposed schedule changed the hours of 16 to 18 cocktail servers' shifts by more than two hours. *Id* at 39:20-22. As explained above, the proposed change would have eliminated shifts, which would then create new shifts, requiring cocktail servers to go through a bumping process which would be both disruptive to the staff and take a significant amount of time. *Id* at 40:19-23. Nigrelli was one of the shifts that Dow intended to change. *Id*. If Dow's proposal would have been adopted, Nigrelli's hours on Monday and Tuesday would have changed from 5:00 p.m. – 1:00 a.m. to 8:00 p.m. – 4:00 a.m. ECF No. 4 ¶ 17; **Exhibit 2** at 86:1-10; 99:23-100:12. Kabetso testified that implementing Dow's proposed schedule, although compliant with the CBA, would have been disruptive to the casino floor and crush employee morale. **Exhibit 3** at 23:25-24:1-3. This proposed schedule never went into effect. *Id* at 6-10.

### 2.    Post Schedule Change in April 2015

From approximately January 8, 2015 through April 8, 2015, Dalton held eight meetings with Defendant's management, Plaintiff and the affected cocktail servers. ECF No. 4 ¶¶ 19, 21, 23-32, 36; *see also* **Exhibit 4** at 13:23-14:1. Plaintiff participated in most or all of the meetings. ECF No. 4 ¶¶ 19, 21, 23-32, 36; **Exhibit 2** at 87:2-13; 89:16-90:23; **Exhibit 3** at 43:13-18. Kabetso became formally involved in February 2015, at which time he proposed approximately sixteen server schedules, including that of the Plaintiff. ECF No. 4 at ¶ 18; **Exhibit 2** at 179:15-22. Unlike the schedule proposed by Dow, Kabetso's proposed schedule was in compliance with the two-hour rule, and did not result in the elimination of any shifts. **Exhibit 2** at 92:16-25; **Exhibit 3** at 86:18-

25; **Exhibit 4** at 52:16-21.  Defendant is allowed to adjust schedules under the two-hour rule without regard to seniority.  **Exhibit 2** at 94:23-95:1, 110:1-13, 114:3-23, 130:11-16; **Exhibit 3** at 86:18-25; **Exhibit 4** at 53:4-9.

Defendant implemented the schedule changes on or around April 13, 2015.  ECF No. 4 ¶ 82.  Nigrelli and approximately sixteen other cocktail waitresses had a change in schedule due to the change in future business demands.  *Id.* at 61:3-6.  Defendant elected to change the hours of the Pit 3 shift to 7:00 p.m. to 3:00 a.m. each day of the week, but did not change the hours of the Pit 1 shift.  **Exhibit 3** at 5-10.  Pit 1 shift stayed at 5:00 p.m. to 1:00 a.m. each day of the week because the "main server" was scheduled for that specific time five days a week.  *Id* at 69:6-16.

When the new schedule was implemented, Plaintiff was still working the same shift and station she bid for in 1999 save for the one hour change on Friday.  The only change in schedule Nigrelli sustained as of April 13, 2015 was a two-hour change on Monday and Tuesday.  **Exhibit 2** at 61:11-62:6.[6]

| Days | Friday | Saturday | Sunday | Monday | Tuesday |
|------|--------|----------|--------|--------|---------|
| Hours | 7 pm to 3 am | 5 pm to 1 am | 5 pm to 1 am | **7 pm to 3 am** | **7 pm to 3 am** |
| Locations | Pit 9 | Pit 2 | Pit 2 | Pit 3 | Pit 3 |

### E.    The Grievance Process

On April 14, 2015, Plaintiff filed a grievance with the Union disputing her Monday and Tuesday schedule change.  ECF No. 4 at ¶58; Initial Grievance, attached hereto as **Exhibit 7**.  The grievance was assigned to Grievance Specialist Ester Dyer.  ECF No. 4 at ¶ 59.  On April 30, 2015, Nigrelli participated in an Internal Resolution process with Kabetso and Shop Steward Pam Parra

---

[6]    The change in Nigrelli's schedule on Monday and Tuesday was within the two-hour rule, meaning the change did not eliminate her shift.  *Id* 97:1-19.  Nigrelli alleges that co-worker Dana Wagner ("Wagner") received priority in scheduling over Nigrelli.  *Id.* at 312:1-15.  Nigrelli believes that because she has more seniority than Wagner, Nigrelli's hours on Monday and Tuesday should have remained the same from 5:00 p.m. to 1:00 a.m.; and Wagner's hours on Mondays and Tuesdays should have changed to 7:00 p.m. to 3:00 a.m.  *Id.* at 312:1-15.  However, Nigrelli admits that both before and after the change in schedule, Wagner worked in a different pit than Nigrelli.  *Id.* at 119:3-22.

as required in the CBA.  *Id.* at ¶ 61.  Because there was no resolution, the second step of the grievance process is a Board of Adjustment meeting.  **Exhibit 2** at 193:11-14.

The Board of Adjustment took place on May 21, 2015. *Id.* at 197:2-15.  In attendance, and on behalf of the Defendant was human resources employee Casey Dake, and Kabetso.  *Id.*  Nigrelli and Union representative Dyer were also in attendance.  *Id.*  Dyer asked Kabetso if it was possible to change Nigrelli's schedule back to 5:00 p.m. to 1:00 a.m., Kabetso stated that it was possible to change, but only in the literal sense, because doing so would trigger the rebidding situation that led the Union to object to the schedule proposed by Dow.  *Id.* at 198:22-25.  Kabetso further indicated that the schedule actually put into effect was in full compliance with the CBA.

The parties did not reach agreement at the Board of Adjustment.  Nonetheless, Dryer reiterated her request that Monte Carlo rescind the change in Nigrelli's schedule.  *Id.*  Monte Carlo declined, again explaining that it could not accommodate Nigrelli's request nor was it required to do so under the Agreement.  *Id.*  On November 2, 2015, the Union dismissed Nigrelli's grievance without submitting it to arbitration because the Union and its counsel believed that the grievance had no merit.  *See* Union's Grievance Determination attached as **Exhibit 8**.

### F.  Plaintiff's National Labor Relations Board Charge

Nigrelli filed an unfair labor practice charge with the National Labor Relations Board ("NLRB") against the Union.  *See* **Exhibit 9**.  The unfair labor charge was based on the same conduct that forms the basis for this lawsuit: the Union's alleged breach of the duty of fair representation.  *Id.*  The NLRB dismissed Nigrelli's unfair labor practice charge because "there is insufficient evidence to establish a violation of the Act."  **Exhibit 2** at 218:7-15; *see also* NLRB Determination attached as **Exhibit 10**.

## III.  LEGAL STANDARD

Summary judgment is appropriate if, viewing the evidence in the light most favorable to the party opposing the motion, there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  There is no

genuine issue of material fact if, on the record taken as a whole, a rational trier of fact could not find in favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

A party opposing summary judgment cannot simply rely on the pleadings and the party's own deposition testimony. *Villiarimo v. Aloha Island Air Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (holding that "uncorroborated and self-serving testimony," without more, will not create a "genuine issue" of material fact precluding summary judgment). Rather, to survive summary judgment, the party opposing the motion must provide "concrete" evidence supporting his claims and which would support a verdict in his favor if the case were to proceed to trial. *See, e.g., Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 345 (9th Cir. 1995) (nothing that conclusory or speculative testimony is insufficient to raise a genuine issue of fact to defeat summary judgment); *O.S.C. Corp v. Apple Computer, Inc.*, 792 F.2d 1464, 1467 (9th Cir. 1986) (evidence must be concrete and cannot rely on "mere speculation, conjecture, or fantasy"). As demonstrated herein, Plaintiff has no evidence to support her claim, and Defendants are entitled to summary judgment as a matter of law on Plaintiff's remaining Section 301 claim.

## IV.   ARGUMENT

Plaintiff's First Amended Complaint sets forth three causes of action. Plaintiff's first cause of action is for the breach of the Collective Bargaining Agreement by supposedly failing to implement the seniority provisions when Nigrelli's schedule was changed. ECF No. 4 at ¶ 89. The second cause of action alleges that the Union breached the duty of fair representation. The third seeks declaratory relief regarding the meaning of the CBA. Taken together, the Complaint alleges a single cause of action: a hybrid claim under Section 301 of the Labor Management Relations Act. *See Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 412 (1988). "In order to prevail in any such suit, the plaintiff must show that the union and the employer have both breached their respective duties," meaning that Nigrelli must show that her schedule change violated Articles 20 and 23 of the CBA, and that the Union violated its duty of fair representation in failing to pursue her grievance to arbitration. *Bliesner v. The Communication Workers of America*, 464 F.3d 910,

913 (9th Cir. 2006).  "[T]he two claims are inextricably interdependent.  To prevail against either the company or the Union … [employee-plaintiffs] must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating breach of duty by the union."  *Id.* (quoting *DelCostello v. Int'l Bhd. Of Teamsters*, U.S. 151, 164-165, 103 S. Ct. 2281 (1983)).

    **A.**    **The Court Should Enter Summary Judgment In Favor of Monte Carlo Because Nigrelli Cannot Establish A Violation Of The Collective Bargaining Agreement.**

    Collective bargaining agreements are interpreted according to their plain meaning.  *See, e.g., American Postal Workers Union, AFL-CIO v. U.S. Postal Service*, 940 F.2d 704, 707-08 (D.C. Cir. 1991) ("In the absence of ambiguity in the collective bargaining agreement, however, we have no cause to examine extrinsic evidence of the parties' intent").  In the event a collective bargaining agreement is ambiguous, the ambiguity should be resolved by looking to past practice and, when possible bargaining history.  *See Huber, Hunt & Nichols, Inc. v. United Assoc. of Journeymen and Apprentices of the Plumbing and Pipefitting Indus.*, 282 F.3d 746, 751 (9th Cir. 2002).  Here, the plain meaning of the Management Rights Clause confirms Monte Carlo's authority to make schedule adjustments, and its plain meaning disposes of Plaintiff's claim.  In order for Nigrelli to prevail, she must establish that honoring seniority is a condition precedent under the CBA before making a schedule change.  But the text of the Management Rights Clause provides otherwise.  Seniority is merely a factor among many other factors that should be considered when exercising any management right.  It is not controlling.  There is also no dispute that Monte Carlo's schedule change complied with Monte Carlo and the Union's established past practice.  It fell within the "two hour rule" and it conformed to the past practice requiring relief shift cocktail servers to match the schedule of the server to whom she is providing relief.  Monte Carlo is therefore entitled to summary judgment.

    **1.**    **The Plain Meaning of The Collective Bargaining Agreement Confirms Monte Carlo's Right To Modify Nigrelli's Scheduled Start Times By Two Hours.**

    Both Defendant and the Union agree that Article 23.01 of the Agreement allow Defendant's to make changes to employee schedules.  Article 23.01 gives Defendant the right to manage the

1   "business, and the direction of its employees. "Such rights include the right to direct, plan and

2   control operations, to determine the number of employees to be employed, and to **determine the**

3   **means, methods, and schedules of operations**." *Id.* at 61. "By the CBA there's no contractual

4   right that we have to look at seniority with making these changes." **Exhibit 3** at 86:18-25. The

5   Management Rights Clause's specific reference to seniority and the manner in which the

6   Agreement leaves seniority to the Company's discretion is controlling. *See, e.g., Feibusch v.*

7   *Integrated Device Tech. Inc.*, 463 F.3d 880, 885 (9th Cir. 2006) ("Under well-settled contract

8   principles, specific provisions control over more general terms."); *see also* RESTATEMENT

9   (SECOND) OF CONTRACTS § 203. Monte Carlo adjusted its entire cocktail schedule in order to meet

10  business needs.

11        Nothing in the Management Rights Clause or any other provision **conditions** its authority

12  to make such schedule modifications on employee seniority. The fact that both of the contracting

13  parties, Monte Carlo and the Union, agree on this interpretation of the CBA is incontrovertible

14  evidence of the parties' intent. *See, e.g., Dragomier v. Local 1112 Int'l Union UAW*, 64 F. Supp.

15  3d 1033, 1038 (2014) (granting summary judgment on Section 301 hybrid claim because, given

16  that the Union and the Employer agreed on the meaning of the CBA, the contract's interpretation

17  was not in dispute). In fact, Nigrelli essentially conceded in both her deposition and discovery

18  responses that there is no language in the CBA which supports her contention that the "seniority

19  protocols" have been violated. ECF No 4. at ¶ 89. In her deposition, she admitted that the basis

20  for her claim that "anything that you do with the cocktail service is done by seniority" is a comment

21  supposedly made by a Union representative during a meeting, not personal knowledge. **Exhibit 2**

22  at 38:19- 39:6. Nigrelli was then questioned about each of the six subsections in Article 20, and

23  she admitted that none of them applied[7]:

24        **Q. Do you have any basis for believing that Article 20.01,**
          **"Probationary Period," has been violated?**

25
          A. No.

26

_____

27  [7]       Nigrelli's counsel objected that the questions called for a legal conclusion. That objection
    has no merit when the question goes to the heart of a litigant's claim that a contract has been
28  violated. Nigrelli was asked to point to the language in the collective bargaining agreement which
    allegedly supported her claim. She could not do so, because there is no such language.

**Q. Do you have any basis for believing that Article 20.02, "Definition of Seniority" on page 51 has been violated?**
A. No

…

**Q. Do you have any basis for believing that Article 20.03, Subsection A, has been violated by moving your schedule on Mondays and Tuesdays?**

A. This was not a layoff or a recall.

**Q. Okay. So Article 20.03 doesn't apply to this situation?**

A. No

**Q. … Article 20.04, "Promotions and Preference for Shift." Do you have any belief, or any basis for believing that Article 20.04 has been violated by moving your start times on Monday and Tuesdays?**

A. It doesn't pertain. It wasn't a promotion or a preference for shift. It wasn't a bidding. It wasn't a bidded –

…

**Q. Do you have any basis for believing that Article 20.05, "Break in Continuous Service and Seniority" has been violated by moving your start times on Mondays and Tuesdays?**

A. It has – there's no basis for – it wasn't a break in service.

**Q. Okay. Do you have any basis for believing that Article 20.06 on page 54 of the agreement has been violated?**

A. Doesn't pertain to it.

**Exhibit 2** at 33:2-22; 37:2-18; 38:9-18.

In short, Nigrelli's breach of contract claim has no textual foundation. Neither the Management Rights Clause nor Article 20 of the Agreement supports Nigrelli's position. *Id.* Nigrelli admitted that none of the provisions in Article 20 were violated by Defendant. Based on Nigrelli's own sworn statements, there is genuine issue of material fact with respect to the plain meaning of the CBA. The Court should enter summary judgment in Monte Carlo's favor on that basis.

### 2.      Nigrelli's Schedule Change Conformed with Past Practice

Even if the Court were to conclude that the express language of the Management Rights Clause, when combined with the express absence of limiting language in Article 20 Seniority, were somehow ambiguous, Monte Carlo's motion should still be granted.  As described in detail above, Monte Carlo clearly acted within the scope of past practice by relying on the two hour rule when it modified Nigrelli's Monday and Tuesday start times.  Bargaining history and past practice are extraordinarily important when construing a collective bargaining agreement.  *See Huber, Hunt & Nichols, Inc. v. United Assoc. of Journeymen and Apprentices of the Plumbing and Pipefitting Indus.*, 282 F.3d 746, 751 (9th Cir. 2002).  Here, all of the extrinsic evidence confirms that fact, and under established law, summary judgment is appropriate when contractual language is ambiguous, so long as "extrinsic evidence leaves no genuine issue of material fact and permits contract interpretation of the agreement as a matter of law."  *Averill v. Gleaner Life Ins. Soc*. 626 F. Supp. 2d 756, 761 (N.D. Ohio 2009).

### a.      Monte Carlo complied with the two hour rule.

There is no dispute that Monte Carlo and the Union have a past practice which permits the Company to make schedule modifications without rebidding so long as the amended start time is within two hours of the original bidded for start time.  Without reiterating the facts set forth above, Plaintiff can offer nothing to dispute the testimony of Kabetso, who has operated under the collective bargaining agreement for almost a decade, or Dalton, who has even more experience.  Even Nigrelli recognizes and abides by the aforementioned principle.  When asked about it during her deposition, she conceded that "you can change a schedule by two hours in one day." **Exhibit 2** at 97:17-19.  In response to the follow up question of "Because a two-hour change is fine.  It's a two-hour and one minute change that would not be fine?" Nigrelli responded "Correct." *Id.*

There is also no dispute that the Company complied with the two hour rule.  Again, as noted above, Nigrelli's schedule was changed only on Mondays and Tuesdays, and only by delaying her start time for two hours.  Although no court has considered such a situation, it is important to note that two different labor arbitrators have heard claims around the two hour rule and confirmed Monte Carlo's interpretation of the collective bargaining agreement.  In an arbitration involving *Flamingo*

*Hotel and Culinary Workers Union Local 226*, Arbitrator Thomas Angelo, who heard cases under the Culinary Contract for three decades, noted that "evidence indicates that since 1982 the parties have operated with a '60% and two hours rule' to determine whether a shift has 'changed.'" 1997 WL 24154 attached as **Exhibit 5** at p. 9-10.  On that basis, Arbitrator Angelo concluded that the employer did not violate the collective bargaining agreement when it modified a bell person's scheduled start times by one or two hours.  *Id.*

In a case very similar to the one at issue here, Arbitrator Norman Brand, who has been hearing disputes under the Union contract for more than two decades, also recognized the existence of the two hour rule and applied it to conclude that the Sahara Hotel and Casino did not violate the collective bargaining agreement when it rescheduled its entire casino pit cocktail staff by two hours, and then rescheduled the same servers by an additional two hours several months later.  **Exhibit 6,** *In the Matter of the Sahara Hotel & Casino and Culinary Workers Union Local 226* at p. 16 (Arb. Brand June 23, 2008).  Arbitrator Brand explained that the Sahara acted within the discretionary authority of the Management Rights Clause, and did not violate the agreement.

Taken together, the parties' past practice, Nigrelli's admission of the two hour rule, and the aforementioned arbitrator awards confirm that Monte Carlo did not violate the CBA.  The Court should reach the same conclusion, and enter summary judgment.

> **b.   Monte Carlo could not reassign Nigrelli to a different pit because doing so would violate the CBA and the past practice that the relief shift follows the main shift.**

Finally, it is important that the Court understand that Nigrelli's interpretation cannot be adopted because it seriously disrupt Monte Carlo's scheduling process.  Nigrelli's point of contention rests with Dana Wagner, where she alleges that Wagner kept her same shift.  Although it is true that Wagner is a relief cocktail server, her specific pit assignments for Monday and Tuesday were not the same as Nigrelli's.  When instituting a change in schedule to a particular station, it requires that all shifts for that particular station also be changed, otherwise there would be significant overlap.  Here, Nigrelli's schedule was changed in pit 3 on Monday and Tuesday because the main shift changed by two hours.  Since Nigrelli was the relief server, her schedule needed to change in accordance with main cocktail server for pit 3.  As Kabetso testified that

1   "seniority has nothing to do with the two-hour time change" to Nigrelli's schedule.  **Exhibit 3** at

2   86:18-25.  "Changes made overall and past practice and consistency of relief shift following the

3   main shift are all the reasons why [Defendant] made that change to pit 3 and to [Nigrelli's] hours."

4   *Id.*

5         Adoption of Nigrelli's position would have a dramatic and negative impact on the Company

6   and the Union.  It would require the Company to violate the contract by separating other cocktail

7   servers from their bidded schedules, which includes the station assignments.  It would trigger

8   changes throughout the schedule, as individuals working relief schedules would suddenly acquire

9   the ability to bump less senior employees from other stations and areas, even in situations where

10  the only schedule up for bid is the relief schedule.  The Court should not interpret the CBA in a way

11  that leads to an absurd result.  *See Browning Ferris Indus. v. Union De Tronquistas*, Local 901, 29

12  F.3d 1, 3 (1st Cir. 1994) (noting that "The utter absence of textual support agreeably precludes any

13  interpretive quandary.").

14      **B.      The Union Did Not Violate its Duty of Fair Representation**

15        If this Court determines that Defendant did in fact violate the terms of the Agreement,

16  Plaintiff's claim still fails as a matter of law because Nigrelli cannot establish that the Union

17  violated its duty of fair representation.  Nigrelli alleges the Union breached its duty by failing to

18  comply with the grievance procedures and failing to submit the grievance to arbitration.  "The duty

19  of fair representation is construed narrowly and unions are afforded wide discretion in connection

20  with acting in what they perceive to be the best interests of the bargaining unit."  *Newman*, 2012

21  U.S. Dist. LEXIS 79630 at *21 (citing *Peterson v. Kennedy*, 771 F.2d 1244, 1253-155 (9th Cir.

22  1985)).  "Unions are not liable for good faith non-discriminatory errors of judgment made in the

23  processing of grievances."  *Id.* (citing *Steven v. Moore Bus. Forms, Inc.*, 18 F.3d 1443, 1447 (9th

24  Cir. 1994)).  Pursuant to its duty of fair representation, "a union has an obligation to avoid 'arbitrary,

25  discriminatory or bath faith conduct' in connection with the exclusive representational functions,

26  including the processing of grievances."  *Id.* (citing *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S. Ct. 903

27  (1967)).

28

### 1.      The Union Did Not Act Arbitrarily

The Union did not act arbitrarily in addressing Nigrelli's grievance. "A union acts arbitrarily only if it shows an egregious or reckless disregard for the rights of those it represented." *Id.* at *21-22 (citing *Patterson v. International Brotherhood of Teamsters, Local 959*, 121 F.3d 1345, 1349 (9th Cir. 1997)). "An employee has no absolute right to have his grievance taken to arbitration, and the union may reject unmeritorious grievances at the first step in the contractual procedure." *Evangelista v. Inlandboatmen's Union of Pac.*, 777 F.2d 1390, 1395 (9th Cir. 1985) (citing *Vaca*, 386 U.S. at 191). If the union's interpretation of the collective bargaining agreement is reasonable and not made in reckless disregard of an employee's rights, a court should not second-guess the decision not to arbitrate a grievance. *Id.* at 1396.

As set forth above, the undisputed evidence establishes that 1) the Union and its representatives made countless attempts to urge Defendant and its managers to alter Nigrelli's schedule; 2) when informal attempts were unsuccessful the Union followed each step of the grievance process; and, 3) it dropped the grievance only after it determined it had no merit and could not be resolved through informal negotiation. The Union elected to not proceed to arbitration because the Union would likely lose if it did so. The terms of the CBA as well as the applicable past practice were clear. The Union did not breach its duty of fair representation by withdrawing a meritless grievance. *See Williams v. Sea-Land Coro.*, 844 F.2d 17 (1st Cir. 1988) (a union does not breach the duty of fair representation when it declines to pursue a grievance it believes is unlikely to succeed in arbitration); *Crider v. Spectrulite Consortium*, 130 F.3d 1238, 1241 (7th Cir. 1997) (employee could not establish breach of duty of fair representation when he failed to heed union' advice during the grievance process). There is no basis for second-guessing the Union's decision. *See Air Line Pilots Association v. O'Neill*, 499 U.S. 65 (1991).

### 2.      The Union Did Not Act in a Discriminatory Manner or in Bad Faith

"When the union's judgment is at issue as to the most appropriate manner in which to evaluate or settle a grievance- the union breaches the duty of fair representation only when its actions are either 'discriminatory' or 'in bad faith.'" *Newman*, 2012 U.S. Dist. LEXIS 79630 at *23 (citing *Castelli v. Douglas Aircraft Co.*, 752 F.2d 1480, 1482 (9th Cir. 1993)). A union's

actions are discriminatory only if the union, without a rational basis, treated similarly situation employees in a disparate manner. *Id*. at *26-27 (citing *Barton Brands v. NLRB,* 529 F,2d 793 at 799 (7th Cir. 1976)); *see also Beck v. United Food and Commercial Workers, Local 99,* 506 F.3d 874, 880 (9th Cir. 2007) (the discrimination must be "internal, severe, and unrelated to legitimate union objectives.") A union's actions are in bad faith only if there is evidence of "fraud, or deceitful or dishonest action." *Marquez v. Screen Actors Guild*, 124 F.3d 1034, 1038 (9th Cir. 1997). "Bad faith requires a showing of improper intent, purpose, or motive." *Id*. at *23 (citing *Spellacy v. Airline Pilots Association- International,* 156 F.3d 120 (2nd Cir. 1998). Unsubstantiated allegations of alleged ill will do not establish a showing of bad faith. *Conkle v. Jeong*, 73 F.3d 909, 916 (9th Cir. 1995).

There is no evidence that the Union pursued other claims connected to the schedule change but declined to pursue Nigrelli's grievance for discriminatory reasons. The Union timely filed a grievance on behalf of Nigrelli. Both Dyer and Dalton pushed the Company to reconsider even when the Union had no contractual basis for doing so. The Union ultimately elected to refrain from arbitrating Plaintiff's grievance due to the fact that the Defendant's actions did not violate any part of the Agreement. Nigrelli speculated during her deposition that others may have received favorable treatment, but none of that speculation was connected to the Union and its decision to drop her claim. The National Labor Relations Board conducted a complete investigation, including a comprehensive review of her allegations against the Union and found that Nigrelli's claim fails as a matter of law. The Court should reach the same conclusion and enter summary judgment in favor of the Defendants.

### C.      Declaratory Relief is Not an Independent Cause of Action

Declaratory relief is not a cause of action recognized by the federal courts or Nevada law, and the manner in which it is pleaded here simply duplicates the first and second causes of action and includes a request for injunctive relief. *See generally Audette v. International Longshoremen's & Warehousemen's Union, Local 24,* 195 F.3d 1107, 1111 n. 3 (9th Cir. 1999); *Leung*, 2013 U.S. Dist. LEXIS, *14 (citing *In re Wal-Mart Wage & Hour Employment Practices Litig.*, 490 F. Supp.

1  2d 1091 (D. Nev. 2007) (check to make sure this is for declaratory relief and not injunctive).

2  Injunctive relief is a remedial issue; it does not go to the merits.  The Third Cause of Action should

3  therefore be dismissed.

4  **V.      CONCLUSION**

5      For the foregoing reasons, Monte Carlo's Motion for Summary Judgment should be granted.

6  Dated this 20th day of June, 2016.

7                            JACKSON LEWIS P.C.

8

9                          _____/s/ Paul T. Trimmer_____

10                          Paul T. Trimmer, Bar #9291
                        Mahna Pourshaban, Bar #13743

11                          3800 Howard Hughes Parkway, Suite 600
                        Las Vegas, Nevada 89169

12                          *Attorneys for Defendant*

13                          *Victoria Partners d/b/a*
                        *Monte Carlo Resort and Casino*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I am an employee of Jackson Lewis P.C., and that on this 20th day of June, 2016, I caused to be served via the Court's CM/ECF Filing, a true and correct copy of the above foregoing **MOTION FOR SUMMARY JUDGMENT** properly addressed to the following:

Anthony M. Santos
A.M. SANTOS LAW, CHTD.
3275 S. Jones Blvd., Ste. 104
Las Vegas, Nevada 89146

Frederick A. Santacroce
SANTACROCE LAW OFFICES, LTD.
3275 S. Jones Blvd., Ste. 104
Las Vegas, Nevada 89146

*Attorneys for Plaintiff*
*Lisa Nigrelli*

Kristin L. Martin
MCCRACKEN STEMERMAN & HOLSBERRY
1630 S. Commerce St., Ste. A-1
Las Vegas, Nevada 89102

*Attorneys for Defendant*
*Culinary Workers Union Local 226*


_____/s/ Emily Santiago_____
Employee of Jackson Lewis P.C.