UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| LISA NIGRELLI, | ) |
|               Plaintiff, | ) Case No.: 2:15-cv-1840-GMN-NJK |
|   vs. | ) |
| | ) **ORDER** |
| VICTORIA PARTNERS d/b/a MONTE CARLO RESORT AND CASINO; CULINARY WORKERS UNION, LOCAL 226, | ) |
|               Defendants. | ) |

Pending before the Court are two Motions for Summary Judgment, one filed by Defendant Culinary Workers Union, Local 226 (the "Union") (ECF No. 22), and the other filed by Defendant Victoria Partners d/b/a Monte Carlo Resort and Casino ("Monte Carlo") (ECF No. 29). Plaintiff Lisa Nigrelli ("Plaintiff") filed Responses to both motions. (ECF Nos. 32, 34). Both the Union and Monte Carlo (collectively, "Defendants") filed Replies. (ECF Nos. 40, 50).

Also pending before the Court are two Motions to Strike (ECF Nos. 41, 42) filed by the Union, to which Plaintiff filed Responses (ECF Nos. 55, 56), and the Union filed Replies (ECF Nos. 57, 58).[1]

---

[1] Monte Carlo also filed a Motion to Strike, which does not include any further argument, but rather "joins in and incorporates by reference all arguments set forth in the Union's Motion[s] to Strike." (Monte Carlo Mot. to Strike 1:28–2:2, ECF No. 54). Accordingly, the Court will construe this Motion to Strike as a Joinder to the Union's Motions to Strike.

## I. BACKGROUND

This case arises out of a schedule change made for Plaintiff, who has been employed as a cocktail server at Monte Carlo Resort and Casino since 1996. (Am. Compl. ¶ 10, ECF No. 4). The Union represents Plaintiff and the other cocktail servers at Monte Carlo, and the Union's Collective Bargaining Agreement ("CBA") with Monte Carlo governs Plaintiff's employment. (Pl. Dep. 25:24–26:5, Ex. 2 to Union MSJ, ECF No. 23-2); (Dyer Aff. ¶ 5, ECF No. 24). Approximately fifty cocktail servers work in Plaintiff's department, which is the black jack gaming area. (Am. Compl. ¶¶ 12–13). According to Plaintiff, "Based on seniority Plaintiff was designated as cocktail server number #16. Due to resignations Plaintiff is now #4." (*Id.* ¶ 14). Plaintiff's original schedule, set by seniority, was "Friday, 7:00 p.m. to 3:00 a.m.; Saturday, 5:00 p.m. to 1:00 a.m.; Sunday, 5:00 p.m. to 1:00 a.m.; Monday and Tuesday, 5:00p.m. to 1:00 a.m.; and off on Wednesday and Thursday." (*Id.* ¶ 15); (Pl. Dep. 62:7–63:21). In January 2015, Beverage Manager Phillip Dow ("Dow") proposed a new schedule, which included a change in Plaintiff's schedule on Monday and Tuesday to 7:00 p.m. to 3:00 a.m. (Am. Compl. ¶ 16–17); (Pl. Dep. 61:11–62:6). Over the next few months, there were several meetings regarding the schedule changes. Department Head Johanna Dalton ("Dalton") was a Union representative present at most of these meetings. (Am. Compl. ¶ 24).

The final meeting regarding the schedule took place on April 8, 2015. (*Id.* ¶ 37). Other Union representatives were present, but not Dalton. Plaintiff was present, along with Director of Beverage Nick Kabetso ("Kabetso") and Human Resources Representative Casey Dake ("Dake") on behalf of Monte Carlo. (*Id.* ¶¶ 38–40). At this meeting, Plaintiff's hours were permanently changed to include Monday and Tuesday to 7:00 p.m. to 3:00 a.m., effective April 13, 2015, allegedly against her repeated requests and with no opposition by the Union representatives. (*Id.* ¶¶ 41–46); (*see also* Pl. Am. Decl. ¶ 46).

On April 15, 2015, Plaintiff filed a grievance with the Union regarding her hours and "the failure to abide by the seniority protocols as called for under Article 20 of the collective bargaining agreement." (*Id.* ¶ 58); (Initial Grievance, Ex. 2 to Pl. Resp. to Union MSJ, ECF No. 32-2). Grievance Specialist Ester Dyer ("Dyer") was assigned to Plaintiff's grievance. (*See* Dyer Aff. ¶ 14). On April 30, 2015, Plaintiff participated in an Internal Resolution Process with Kabetso and Shop Steward Pam Parra ("Parra"), pursuant to the CBA, which did not yield a resolution. (Am. Compl. ¶¶ 61–62); (Pl. Dep. 192:13–196:21). Although Dyer originally indicated that "she thought she could resolve" Plaintiff's issue, Plaintiff was shortly thereafter informed that the grievance was not resolved and it would have to go to the Board of Adjustment. (Am. Compl. ¶¶ 63–64); (Dyer Aff. ¶ 15).

The Board of Adjustment meeting occurred on May 21, 2015, and included Plaintiff, Dyer, Kabetso, and Dake. (Am. Compl. ¶¶ 65–66); (Dyer Aff. ¶ 16). According to Plaintiff, Kabetso "admitted that he covered all names up and did not do the schedule according to seniority." (Pl. Am. Decl. ¶ 36). Upon inquiry by Dyer, Kabetso indicated that it was possible he could change Plaintiff's schedule back to her original hours. (*Id.* ¶¶ 37–38); (Dyer Aff. ¶ 17). The meeting concluded with Dyer and Kabetso saying that they would get back to Plaintiff. (Pl. Am. Compl. ¶ 38).

In his deposition, Kabetso explained that throughout the original discussions regarding the schedule changes, he considered Plaintiff's hour request; however, he stated, "[W]e weren't going to make that change because . . . we wanted to keep it consistent. Pit 3 [Plaintiff's Monday-Tuesday location] always starts at 7:00 p.m., so we were going to keep her two Pit 3 days to match Pit 3 the other five days of the week at 7:00 p.m." (Kabetso Dep. 53:2–14). He further explained that as an "olive branch" to the Union, he "consider[ed] seniority" in the changes "when possible." (*Id.* 81:2–3). Additionally, he clarified that the "relief shift follows the main five-day-a-week schedule." (*Id.* 73:2). He indicated that seniority did not affect that

consistency practice (*id.* 73:3–4); nevertheless, he had "looked at seniority [when they] chang[ed] the five-day-a-week person" in Pits 1 and 3 (*id.* 81:2–8).

In the two months following the Board of Adjustment meeting, Plaintiff repeatedly contacted Dyer to follow up. (Pl. Am. Decl. ¶¶ 39–42). On July 13, 2015, Dyer called Plaintiff back to inform her that "she was still waiting to hear from the hotel." (*Id.* ¶ 43).

On September 24, 2015, Plaintiff filed her case in this Court (*see* Compl., ECF No. 1), and amended it as a matter of right on October 5, 2015 (*see* Am. Compl.). Plaintiff's Amended Complaint asserts the following three causes of action: (1) breach of contract against all parties; (2) breach of duty of fair representation against the Union; and (3) declaratory relief against all parties for reinstatement of her prior schedule. (Am. Compl. ¶¶ 88–103). On October 30, 2015, the Union filed its Answer (Union Answer to Compl., ECF No. 11), and on November 6, 2015, Monte Carlo filed its Answer (Monte Carlo Answer to Compl., ECF No. 14). Then, on June 10, 2016, the Union filed its Motion for Summary Judgment (ECF No. 22), and on June 20, 2016, Monte Carlo filed its Motion for Summary Judgment (ECF No. 29).

## II.  **LEGAL STANDARD**

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)). A

principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). Then, "the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *Id.* In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go

beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324. At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

### III. DISCUSSION

The Court will first address the motions to strike, then the motions for summary judgment.

#### A. First Motion to Strike (ECF No. 41)

The Union's first Motion to Strike seeks to strike Plaintiff's Declaration (ECF Nos. 33, 35) for failure to include that the declaration was made under "penalty of perjury." (First Mot. to Strike 1:24–2:9, ECF No. 41). Plaintiff subsequently filed an Amended Declaration, declaring "under penalty of perjury, that the foregoing is true and correct." (*See* Pl. Am. Decl. 7:8–9, ECF No. 45). Accordingly, the Court will consider Plaintiff's Amended Declaration as the operative declaration, making the Union's request to strike her original Declaration moot.

Next, the Union presents twenty evidentiary objections to specific paragraphs in Plaintiff's Declaration as lacking personal knowledge under Rule 56(c)(4).[2] Objection 1 asserts that Federal Rules of Evidence ("FRE") 602 and 701 preclude Plaintiff making assertions about the CBA. While Plaintiff is not a party to the CBA, she is an employee covered by the CBA. However, the Court examines issues of contract construction by examining the contract language itself. Plaintiff does not identify where in the CBA these determinations are made

---

[2] Rule 56(c)(4) states: "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

Case 2:15-cv-01840-GMN-NJK   Document 61   Filed 03/30/17   Page 7 of 13

from.  The parties agree that the applicable sections from the CBA are Articles 20.04(b), 21, and 23.01.  Upon review, the Court does not see the information provided by Plaintiff in the CBA.  Accordingly, the Court strikes only the portions "Dow did not go by the contract" and "was a violation of the contract" from paragraph 17.

The Court finds that Objection 2 is proper lay opinion testimony that is based on Plaintiff's perceptions, beliefs, and personal knowledge.  Further, the Court finds that this statement is not irrelevant.

For Objection 3, Plaintiff cannot know what knowledge others had merely because they attended meetings together.  Such an assertion is a speculative assumption.  The Court will strike "so they had knowledge of my situation" from paragraph 27.

For Objection 4, the Union argues that the statement is hearsay under FRE 802, and no exception applies.  Plaintiff responds that it is non-hearsay as a statement of party-opponent under FRE 801(d)(2).  The Union replies that the speaker (Kabetso) is not a party because he is not a representative of the Union, so his statement cannot be used against the Union.  The Court finds that Kabetso is a "party" to the action under FRE 801(d)(2)(D)[3] because Kabetso is an employee of Monte Carlo and made the statement within the scope of that relationship.  The Union does not cite any legal authority that statements of party-opponents are only admissible against one party in a multi-defendant case.  Because the statement is non-hearsay, the Court finds it is admissible against both the Union and Monte Carlo.

Objections 5, 6, 7, 8, 11, 13, and 14 all refer to Plaintiff's statements about the Union's counsel and Dyer, her grievance investigator, misunderstanding or being misinformed about her grievance.  The Court finds that these statements are relevant to Plaintiff's claims, and therefore, the Court will not strike them.

---

[3] FRE 801(d)(2)(D) provides that a statement is non-hearsay if it is "offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed."

The statements in Objections 9, 10, and 12 are facts asserted by Plaintiff. Plaintiff is an employee at Monte Carlo, and she can state when the pit areas are open according to her personal knowledge. If Defendants have contradicting evidence otherwise, then they can provide it. Plaintiff's statements will not necessarily create a disputed fact if other evidence conclusively demonstrates that her personal knowledge was inaccurate. Accordingly, the Court will not strike these statements.

Objections 15, 16, 17, and 18 deal with Plaintiff's statements about two other cocktail waitresses. The Court finds that Plaintiff had sufficient personal knowledge to provide this information, as these women were her colleagues. Information about other similarly situated individuals who were treated differently is relevant here. As such, the Court will not strike these statements.

The Court agrees that the statement referenced in Objection 19 is a legal conclusion. It shall be stricken.

Lastly, as to Objection 20, the Court finds that Plaintiff provided foundation for this statement in paragraphs 24 and 25. As such, the Court will not strike this statement.

Accordingly, the Union's First Motion to Strike is granted in part, denied in part, pursuant to the foregoing,

**B. Second Motion to Strike (ECF No. 42)**

The Union's second Motion to Strike seeks to strike the full transcript of Plaintiff's deposition because "the only pages and lines that [Plaintiff] cites are ones that [the Union] cited and filed with its Motion for Summary Judgment." (Second Mot. to Strike 1:24–26, ECF No. 42). The Union further explains that striking the full transcript will prevent it from objecting to the "many inadmissible statements" included in the transcript. (*Id.* 2:6–10). Plaintiff responds that it provided specific citations to page and line numbers, and the Court can determine "what if any weight to give any specific statement." (Pl. Resp. to Second Mot. to

Strike 2:1–6, ECF No. 56).  The Union replies that no pages of the transcript other than those that it already provided are necessary. (Union Reply, ECF No. 58).

The two cases cited by the Union both detail situations where an entire transcript was provided with no specific page and line cites identified in the motions. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 774-75 (9th Cir. 2002); *see also Carmen v. San Francisco Unified School Dist.*, 237 F. 3d 1026, 1031 (9th Cir. 2001).  Such evidence is properly stricken under Rule 56(e).  However, that is not the situation here.  The Court is capable of examining cited material in an entire transcript to the same extent as it would examine cited material in excerpted pages.  The Court finds no cause to strike Plaintiff's transcript, although it may rely on the Union's version merely for ease of access.  It is the Court's understanding that these documents are identical in the common portions included.  Accordingly, the Union's Second Motion to Strike is denied.

### C. Motions for Summary Judgment

First, the Union argues that although Plaintiff brings three separate claims, Plaintiff's claims actually assert one "hybrid § 301/fair representation claim." (Union MSJ 16:3–9, ECF No. 22).  The Union explains that Plaintiff's first claim, breach of contract, must arise under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), because § 301 preempts state law,[4] and here, the breach of contract claim is based on a collective bargaining agreement. (*Id.* 14:20–15:13) (citing *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 413 (1988); *Cook v. Lindsay Olive Growers*, 911 F.2d 233, 238–39 (9th Cir. 1990)).  Plaintiff does not respond to this argument, but both parties cite the same standard that the Court should apply:

> To prevail . . . Plaintiff must show *both* that the employer violated the collective bargaining agreement, *DelCostello v.* [*Int'l Bhd. of*] *Teamsters*, 462 U.S. 151, 164–65

---

[4] Breach of contract is generally a state law claim.

(1983); *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 570–71 (1976); and that the union violated its duty to represent the employee fairly in the grievance process. *Vaca v. Sipes*, 386 U.S. 171, 190 (1967).

(Union MSJ 16:3–9, ECF No. 22); (Pl. Resp. to Union MSJ 17:24–28, ECF No. 32). The Court agrees. Accordingly, the Court will examine Plaintiff's case as a hybrid § 301/fair representation claim, rather than three separate causes of action.

"[I]t is the policy of the National Labor Relations Act to allow a single labor organization to represent collectively the interests of all employees within a unit, thereby depriving individuals in the unit of the ability to bargain individually." *DelCostello*, 462 U.S. at 165 n.14. Depending upon the terms of the collective bargaining agreement between the union and the employer, the union may have discretion to supervise the grievance machinery established by the collective bargaining agreement. *Vaca*, 386 U.S. at 191. While "a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion," a union may settle a member's grievance against the employer. *Id.* at 191–92. Indeed, the union may settle a member's grievance on terms to which he objects. *See id.* at 192–95. Given the union's authority and the member's vulnerability, the union must "serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *DelCostello*, 462 U.S. at 165 n.14 (quoting *Vaca*, 386 U.S. at 177). In *DelCostello*, the Supreme Court acknowledged the rule permitting a union to exercise discretion over a member's grievance "works an unacceptable injustice when the union representing the employee in the grievance/arbitration procedure acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation. In such an instance, an employee may bring suit against both the employer and the union." 462 U.S. at 164. Courts typically refer to a claim such as this as "a hybrid § 301/fair representation claim." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 988 (9th Cir.

2007) (quoting *Carrion v. Enterprise Ass'n, Metal Trades Branch Local Union 638*, 227 F.3d 29, 34 (2d Cir. 2000)).  A hybrid § 301/fair representation claim has two critical components. *Id.* at 987.  The two are "inextricably interdependent." *DelCostello*, 462 U.S. at 164.  As such, to succeed on a hybrid § 301/fair representation claim, a plaintiff must prove both that the employer breached the collective bargaining agreement and that the union breached its duty of fair representation. *Id.* at 165.

First, in her Complaint, Plaintiff alleges that Monte Carlo breached the CBA "by failing to implement the seniority protocols as mandated therein including the provisions of Article 20 thereof, and by arbitrarily changing Plaintiff schedule to her considerable detriment." (Am. Compl. ¶ 89).

In its Motion for Summary Judgment, the Union argues that Monte Carlo did not breach the CBA when it changed Plaintiff's hours on Mondays and Tuesdays. (Union MSJ 16:24–26). Specifically, in the CBA, "Article 23.01 recognizes Monte Carlo's 'right' to make 'scheduling' decisions, and states, 'Seniority, among other factors, *will be considered* by the employer when making these decisions.'" (*Id.* 17:19–1:1).  The Union asserts that Kabetso's decision to change Plaintiff's start time took seniority into account, just not Plaintiff's seniority:

> Kabetso decided to change the start time of Pit 3 (where [Plaintiff] works on Mondays and Tuesdays) rather than the start time of Pit 1 (where [Dana] Wagner works on Mondays and Tuesdays), one of which is based on seniority. Monte Carlo's practice is to keep the hours that a station is open consistent throughout the week; and the cocktail server who works in Pit 1 on Wednesday through Sunday has more seniority than the cocktail server who works in Pit 3 on Wednesday through Sunday.

(*Id.* 18:5–12) (citing Kabetso Dep. 52:1-53:14, 68:2-69:16, 72:19-73:3, 80:9-82:4, 86:18-25 and Exs. 4, 11; Nigrelli Dep. 136:15-137:4, 153:17-154:1, 182:4-20, 296:7-297:10 and Ex. 26). This explanation also points to a second related reason of keeping the station's hours consistent throughout the week.  Further, as Monte Carlo asserts, it "adjusted its entire cocktail schedule in order to meet business needs." (Monte Carlo MSJ 14:9–10, ECF No. 29).

Plaintiff believes there was a misunderstanding that she wanted Dana Wagner's ("Wagner's") shift, when in fact, Plaintiff's frustration was that Wagner's shift remained at 5:00 p.m. to 1:00 a.m., while Plaintiff's shift was modified, even though Plaintiff had seniority. However, as Kabetso's explanation elucidates, it was not that he chose Wagner over Plaintiff, regardless of seniority. Rather, both were the relief cocktail servers for their respective locations (Pit 1 and Pit 3), working there only Monday and Tuesday. As such, he made the determination regarding hour changes based on the main cocktail servers, the ones who worked in those locations Wednesday through Sunday. The server in Plaintiff's Monday–Tuesday location (Pit 3) had less seniority than the server in Wagner's Monday–Tuesday location (Pit 1). Then, as he explained, "Monte Carlo's practice is to keep the hours that a station is open consistent throughout the week." (Union MSJ 9:18–19, 18:8–10). Plaintiff asserts that Monte Carlo "has made exceptions to this practice." (Pl. Resp. to Union MSJ 18:25–26). However, other exceptions do not make it unreasonable for them to maintain this practice here. Indeed, this appears to be a rational business practice because it would likely be complicated to start shifts at different times when, as Plaintiff stated in her Amended Declaration, Pit 1 and Pit 3 "are both always open." (Pl. Am. Decl. ¶ 58). If Plaintiff worked from 5:00 p.m. to 1:00 a.m., then the next shift would be eight hours, 1:00 a.m. to 9:00 a.m., then the next eight-hour shift would be 9:00 a.m. to 5:00 p.m. However, if Pit 3's main cocktail server worked 7:00 p.m. to 3:00 a.m., then there would be two hours without coverage every Wednesday when the schedules changed from Plaintiff to the main server.[5] Thus, under the CBA, Monte Carlo properly exercised its right to make a scheduling change upon consideration of seniority.[6]

---

[5] Why Monte Carlo could not have both Pit 1 and Pit 3 be on the 5:00 p.m. to 1:00 a.m. schedule is unknown. However, it also is not material, as Monte Carlo, though its employee Kabetso, has established that it took seniority into account as required by the CBA when it changed Plaintiff's hours but not Wagner's hours.

[6] The Union also discusses a longstanding "two-hour rule" wherein "management may change the starting and ending time of an employee's shift by two hours in either direction without creating a new shift." (Union MSJ 4:26–5:2, 17:24–28). Plaintiff vehemently objects to this "two-hour rule" because it is not written anywhere in

Accordingly, the Court finds that Monte Carlo did not breach the CBA. As such, both Monte Carlo and the Union must be granted summary judgment on Plaintiff's hybrid § 301/fair representation claim.

## IV.  CONCLUSION

**IT IS HEREBY ORDERED** that both Motions for Summary Judgment (ECF Nos. 22, 29) are **GRANTED**.

**IT IS FURTHER ORDERED** that the Union's First Motion to Strike (ECF No. 41) is **GRANTED in part, DENIED in part**.

**IT IS FURTHER ORDERED** that the Union's Second Motion to Strike (ECF No. 42) is **DENIED**.

**IT IS FURTHER ORDERED** that Monte Carlo's Motion to Strike (ECF No. 54), construed as a Joinder to the Union's Motions to Strike (ECF Nos. 41, 42), is **GRANTED in part, DENIED in part**, consistent with the Court's rulings on the Union's Motions to Strike.

The Clerk of Court shall enter judgment accordingly and close the case.

**DATED** this ___30___ day of March, 2017.

_____
Gloria M. Navarro, Chief Judge
United States District Court

---

the CBA, nor is it explained in any federal case, but rather, only in two arbitration hearings, as provided by the Union. (Pl. Resp. to Union MSJ 2:4–12, 2:24–28). In his deposition, Kabetso also references this "two-hour rule" and states that because of it, he did not *need* to consider seniority under the CBA; nevertheless, he did in fact consider seniority as an "olive branch" to the Union. (Kabetso Dep. 43:6–12). As such, regardless of the reason, seniority was considered. (*Id.* 81:2–8). The Court finds that the only benefit Monte Carlo derives from the "two-hour rule" is not considering seniority. However, because Monte Carlo did consider seniority in its decision, it complied with the CBA, and any remaining fact issue regarding the "two-hour rule" is not material.